IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

RICKY A. JONES                                                                              PLAINTIFF

v.                              Civil No. 6:18-cv-06030

                                                                                          DEFENDANTS
DR. NANNETTE VOWELL; NURSE RICHARD
MORGAN; NURSE GWENDOLYN HART; and
NURSE C. ROBINSON

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

This is a civil rights action filed by Ricky A. Jones ("Jones") pursuant to 42 U.S.C. § 1983.

Jones proceeds *pro se* and *in forma pauperis.*

At all times relevant to this case, Jones has been incarcerated in the Ouachita River

Correctional Unit ("ORCU") of the Arkansas Department of Correction ("ADC").   Jones

maintains he was deprived of his Eighth Amendment right to adequate medical care when

Defendants exhibited deliberate indifference to his serious medical need to have his vision

corrected by prescription eyewear.   Jones has Marfan syndrome.[1]

Jones has named as Defendants: Dr. Nannette Vowell; Nurse Richard Morgan; Nurse

Gwendolyn Hart; and Nurse C. Robinson.   Jones has sued the Defendants in both their individual

and official capacities.

---

[1] "Marfan syndrome is a disorder that affects the connective tissue in many parts of the body. Connective tissue provides strength and flexibility to structures such as bones, ligaments, muscles, blood vessels, and heart valves. The signs and symptoms of Marfan syndrome vary widely in severity, timing of onset, and rate of progression. Because connective tissue is found throughout the body, Marfan syndrome can affect many systems, often causing abnormalities in the heart, blood vessels, eyes, bones, and joints. The two primary features of Marfan syndrome are vision problems caused by a dislocated lens (ectopia lentis) in one or both eyes and defects in the large blood vessel that distributes blood from the heart to the rest of the body (the aorta)"  https://ghr.nlm.nih.gov/condition/marfan-syndrome (accessed October 2, 2019).

Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3), the Honorable Susan O. Hickey, Chief United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation.   Specifically, the case is before me for the issuance of this report and recommendation on: (1) the Defendants' Second Motion for Partial Summary Judgment (ECF Nos. 73-75) on the issue of exhaustion; and (2) the Defendants' Motion for Summary Judgment (ECF Nos. 83-85) on the merits.   Jones has responded to both motions (ECF Nos. 77-78) and (ECF No. 95).   Defendants filed a reply brief (ECF No. 96).

## I.  BACKGROUND

On October 19, 2013, Jones was seen at EyeQ Vision, PLLC, in Frisco, Texas, and was written a prescription for contacts by Dr. Anisah Shahidzadch.   (ECF No. 95 at 12-13).[2]   Jones was booked into the ORCU on December 8, 2014.[3]   Jones testified during his deposition that his contact lens[4] was taken from him by a security guard within an hour of his arrival.   (ECF No. 84-3 at 25).   Jones underwent an initial examination during the reception process at the ORCU. (ECF No. 84-1 at 3).   Nurse Hart performed a physical examination.   (*Id*).   Nurse Hart noted that Jones had Marfan syndrome, his vision was impaired, he wore contact lenses, did not have eyeglasses, and could hardly see to sign his name on paper.   (*Id*).   The visual screening indicates

---

[2] All references are to the CM/ECF document and page number.

[3] Jones filed this case on March 29, 2018.   For § 1983 actions filed in Arkansas, the applicable statute of limitations is three years.   *Miller v. Norris*, 247 F.3d 736, 739 (8th Cir. 2001)(Ark. Code Ann. § 16-56-105(3) three-year personal injury statute of limitations applies to § 1983 cases).   While state law provides the applicable statute of limitations, federal law applies to the issue of when the cause of action accrues.   *Wallace v. Kato*, 549 U.S. 384, 388 (2007).   The civil rights cause of action accrues when the plaintiff knew or had reason to know of the harm constituting the basis of action.   *Id*.   A continuing violation extends the accrual of a cause of action and exists if:   (1) "the defendants' wrongful conduct must continue after the precipitating event that began the pattern;" (2) "injury to the plaintiff must continue to accrue after that event;" and (3) "further injury to the plaintiff[] must have been avoidable if the defendants had at any time ceased their wrongful conduct."   *Eidson v. State of Tenn. Dep't. of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007).   The issue of the statute of limitations was brought up in Jones' deposition.   (ECF No. 84-3 at 23-24).   However, the issue is not raised in the summary judgment motion.

[4] One of his contact lenses had been torn about one month prior to Jones' intake at ORCU.   (ECF No. 84-3 at 28).

his uncorrected visual acuity in the right eye was 20/0, in the left eye was 20/0, and in both eyes was 20/200.[5]    (*Id.* at 135).    It was noted that Jones had limited vision and eyeglasses were necessary.    (*Id.* at 137).    Jones reported having both blurred vision and double vision.    (*Id.* at 140).

With respect to the Marfan syndrome it was "manifest[ed in Jones] by tall stature, long limbs & fingers, arachnodactyly, scoliosis, aortic root dilation to 4.2cm extending 3 cm, mitral valve prolapse, ocular complications including ocular lens dislocation superiorly, and an incidental 7 mm pulmonary nodule see on CT."    (ECF No. 84-2 at 236).    Jones testified at his deposition that Marfan syndrome had also caused his lungs to collapse and problems with his knuckles.    (ECF No. 84-3 at 19).    Jones also believed, but was not sure, that Marfan syndrome caused problems with his foot.    (*Id*).

On December 12, 2014, Jones was seen at sick call.    (ECF No. 84-1 at 4).    A staff member identified only as "Nurse, Sick Call," noted that Jones needed glasses and his visual acuity was 20/200.    (*Id*).

On December 19, 2014, Dr. Vowell submitted a consult request for Jones to be seen by an optometrist.    (ECF No. 84-3 at 99).    Dr. Vowell wrote that Jones needed glasses, had never had glasses before, and had trouble seeing distance.    (*Id*).    Dr. Vowell noted that Jones' uncorrected vision was 20/200 in both eyes.    (*Id*).    Dr. Vowell stated that Jones needed his vision evaluated and prescription lenses.    (*Id*).

---

[5] Visual acuity is the sharpness of vision, especially as tested with a Snellen chart. Normal visual acuity based on the Snellen chart is 20/20.  Medical Dictionary for the Health Professions and Nursing © Farlex 2012.  "If you have 20/200 visual acuity, the smallest letters you can identify from a distance of 20 feet are the size of the smallest letters a person with historically defined "normal vision" can see from a much greater distance — 200 feet, in this case." https://www.allaboutvision.com/lowvision/legally-blind.htm (accessed October 9, 2019).

On January 15, 2015, Jones was seen by Dr. Vowell who noted he wore contact lenses at home but at the ORCU could not see a thing. (ECF No. 84-1 at 6). Note was made that Jones was seen by an optometrist and referred to the Jones Eye Institute ("JEI") at the University of Arkansas for Medical Sciences ("UAMS"). (*Id*). Dr. Vowell provided Jones with a cane to assist with ambulation. (*Id*).

On January 20, 2015, Dr. Vowell submitted a consult request noting that Jones had Marfan syndrome with subluxated lenses. (ECF No. 84-3 at 100). Dr. Vowell indicated the optometrist had recommended referral to the JEI. (*Id*).

On February 3, 2015, "Nurse, Sick Call" noted Jones had a pending eye appointment with the JEI. (*Id.* at 7). Jones had reported seeing floating colored spots. (*Id*). Jones also reported that all he did was sleep because he could not watch television or read because of his eyes. (*Id*). Upon review, Dr. Vowell indicated that the floaters were not an emergent or urgent issue and they would wait for Jones to be seen by the JEI. (*Id*).

On March 11, 2015, note was made that an appointment was made for Jones to have an evaluation of his eyes due to Marfan syndrome. (ECF No. 84-1 at 156). On March 29, 2015, Jones was seen by Nurse Teeter. (ECF No. 84-1 at 9). Jones complained of blurry vision and stated he wore contact lenses at home. (*Id*). Without his contacts, Jones stated he could not see past his arm's length and had been waiting "to get some glasses or something." (*Id*). Jones was brought to the eye chart but when he stood at the line, he could not see the chart with either eye. (*Id*). With both eyes, he could only make out the E on the first line. (*Id*). Note was made that Jones was at risk for falls. (*Id*). Jones was informed that he had an upcoming eye appointment. (*Id*). Dr. Vowell reviewed the case and noted that Jones had "Marfan's--has disrupted lenses--

blurred vision is chronic--will need surgical intervention--has consult for Jones Eye as well. [N]othing to offer at this time."   (*Id*).

On April 7, 2015, Jones was seen by Dr. Thomas Cannon and Dr. Ellen Ngo at the JEI due to an unspecified visual loss.   (ECF No. 84-1 at 164 & 166).   Jones reported having worn contact lenses prior to his incarceration.   (*Id*. at 166).   His visual acuity was noted to be 20/800 at four feet in the right eye and the left eye at three feet says, "fix and follow."   (*Id*. at 167).   Jones was noted to have Marfan syndrome, subluxation of lens, tear film insufficiency, pre-glaucoma, and to have an unspecified disorder of refraction and accommodation.   (*Id*. at 164).   It was recommended that he have a cardiology consult.   (*Id*. at 166).   The importance of eye protection was discussed to "prevent complete dislocation of lens."   (*Id*).   He was diagnosed with ocular hypertension, an enlarged c/d ratio,[6] and bilateral dry eyes.   (*Id*. at 170).   He was started on latanoprost 0.005% drops, artificial tears, and lacri lube ointment   (*Id*. at 166).   Jones testified that Dr. Cannon did not make a recommendation for glasses or contacts at that time.   (ECF No. 84-3 at 36).

On April 8, 2015, Dr. Vowell performed a record review of the notes from the JEI appointment the prior day.   (ECF No. 84-3 at 96).   She ordered the latanoprost and noted he was to return to the JEI in three months regarding his glaucoma.   (*Id*).

On July 6, 2015, Dr. Vowell submitted a consult request for a doctor at the University of Arkansas Medical Center.   (ECF No. 84-1 at 11).   Dr. Vowell's summary states:

> 32 yr old with Marfan syndrome with subluxated lenses OU—optometrist recommended referral to Jones Eye Institute.   Pt is complaining of blurry vision. He has contact lens at home which he wears for three months at a time.   Contact lens not allowed in prison.   Needs alternative to read—affects his ambulation as

---

[6] C/d or cup-to-disc ratio is a measurement to assess the progression of glaucoma. https://www.hopkinsmedicine.org/wilmer/services/glaucoma/book/ch06s03.html (accessed October 9, 2019).

well.  He can[']t see to sign paper work.  He was seen at Jones Eye in April 2015—recommended 3 month follow up for more measurements.

(*Id*).

On July 27, 2015, note was made that Jones was returning from an appointment at the JEI and the orders were given to Dr. Vowell for review.  (ECF No. 84-1 at 12).  Dr. Vowell noted that Jones was seen at the JEI due to Marfan syndrome with double vision.  (ECF No. 84-3 at 97).  She noted Jones would need to be seen again.  (*Id*).

Jones testified he did not have an appointment at the JEI on July 27, 2015.  (ECF No. 84-3 at 89).  According to Jones, he was not seen until August of 2015.  (*Id*).

On August 13, 2015, Jones was seen by Dr. Vowell.  (ECF No. 84-3 at 98).  Dr. Vowell noted that Jones was "wearing coke bottle glasses not in state frames."  (*Id*).  Dr. Vowell indicated that Jones had never been issued glasses, has Marfan syndrome, and lens detachments.  (*Id*).  Jones testified these were reading glasses.  (*Id*. at 53).  Dr. Vowell indicated that Jones was asked to remove the glasses and refused.  (*Id*).  Dr. Vowell stated that the glasses "must be returned to rightful owner.  [Jones] has not been given glasses.  [D]iscussed how the strain may injur[e] eye muscles—adding to his vision loss due to Marfan's."  (ECF No. 84-3 at 98).

On August 27, 2015, Jones was seen at the JEI by Dr. Richard Morshedi and Dr. Michael Salter.  (ECF No. 84-1 at 175-176).  Jones was diagnosed with pre-glaucoma, Marfan syndrome, subluxation of lens, refractive error, and bilateral dry eyes.  (*Id*).  Jones reported having the worse vision in his life.  (*Id*. at 176).  Dr. Salter concluded Jones should be fitted for medically necessary contact lenses to see if his vision improved.  (*Id*. at 176).  If there was no improvement with the contact lenses, Dr. Salter indicated they might consider cataract surgery.  (*Id*).  Jones' visual acuity was noted to be 20/400 in both eyes.  (*Id*. at 177).

When Jones returned from his appointment at the JEI, it was noted he needed a follow-up with Dr. Brown for "contact lens fitting (medically necessary)."  (ECF No. 84-1 at 14).  He was also to be followed at the glaucoma clinic in four months.  (*Id*).  Dr. Vowell reviewed these notes and a glaucoma follow-up appointment was scheduled for January 7, 2016.  (*Id*. at 15).  No appointment was scheduled for Jones to be fitted for the contact lenses.  (*Id*)

On September 14, 2015, Jones had a follow-up visit with the chronic care clinic.  (ECF No. 84-1 at 186).  It was noted his Marfan syndrome was being followed by the JEI and Jones "needs surgery and contact lens."  (*Id*).  Under assessment, the following was noted:  "Marfan's with lens dislocation—being followed at J[o]nes Eye-waiting for corrective lens."  (*Id*. at 187).

On December 15, 2015, Jones submitted a sick call request.  (ECF No. 84-1 at 22 & 191).  Among other things, Jones complained that he could not see and had not had his "glasses in over a year."  (*Id*).[7]  With respect to his vision complaint, the following note was made:  "Has glasses Protocol used."  (*Id*).

Jones was seen by Dr. Morshedi at the JEI on January 7, 2016.  (ECF No. 84-1 at 28 & 198).  Dr. Morshedi recommended a referral be made to Dr. Brown for "refraction, medically necessary CTLs fitting to see if can improve vision.  If no improvement, may consider cataract surgery."  (*Id*. at 199).

The ADC provides a form that "outside" physicians are supposed to complete and send back to the ADC after having seen an inmate.  (ECF No. 84-1 at 28 & 198).  The form says, among other things, that "[d]ue to security consideration, all recommended tests and treatments are to be scheduled by the Department of Corrections Medical Department."  (*Id*. at 206).  In the

---

[7] Jones has submitted a handwritten copy of a request form dated December 15, 2015.  (ECF No. 95 at 20).  The request is different from the one mentioned above.

diagnosis area of the form accompanying Jones back to the ADC following the January 17, 2016, visit, it states that Jones needed to be fitted for medically necessary contact lenses.   (*Id*).

On January 14, 2016, Dr. Charles Liggett performed a record review noting that Jones had been seen at the JEI on the 7th for Marfan syndrome and spontaneous subluxation of lenses of both eyes.   (*Id.* at 29).

On May 23, 2016, Jones submitted a medical request form.   (ECF No. 84-2 at 18).   He said he was still not able to see, and it had been over a year.   (*Id*).   He asked why he could not just be provided with glasses or contacts.   (*Id*).   Jones indicated the issue could have been fixed long ago.   (*Id*).   In response, Jones was told that the JEI had to reschedule his appointment, but he did have an appointment.   (*Id*).   Further, Jones was told the eye doctor at the JEI would recommend his "eye prescription for glasses if it is needed at this time due to the condition of your eyes."   (*Id*).

On June 2, 2016, Jones was seen at the JEI for a follow-up for glaucoma.   (ECF No. 84-1 at 59).   Dr. Salter again stated that Jones should be scheduled for a contact lens fitting and for a four-month follow-up glaucoma visit.   (ECF No. 84-2 at 19).   Dr. Vowell reviewed the records from the JEI and concluded that Jones needed to be scheduled for a contact lens fitting.   (ECF No. 84-1 at 59).

On September 6, 2016, Jones submitted another health service request form asking for an eye examination.   (ECF No. 84-2 at 32).   Triage notes indicate that based on the June 2, 2016, ophthalmology reported that a recommendation for prescription eyewear had been given.   (*Id*). Dr. Vowell noted that Jones had an upcoming appointment.   (*Id*).

On September 6, 2016, Dr. Vowell submitted a consult request.   (ECF No. 84-1 at 62).

8

Note was made that Jones had been seen at the JEI on January 7, 2016, for "Marfan's syndrome and spontaneous subluxation of lenses of both eyes. (*Id*). Patient is also a glaucoma suspect." (*Id*). Dr. Morshedi had recommended continued use of the eye drops and a follow up visit. (*Id*). An appointment was scheduled for November 23, 2016. (*Id*).

A gate pass dated September 29, 2016, indicates Jones was transported to the JEI for an appointment with Dr. Perin. (ECF No. 95 at 26). There is no other information regarding this appointment.

On October 31, 2016, Jones submitted another medical request form stating that he could not see well; he needed glasses; his vision was getting worse; and his worsening vision was causing him to see things that were not there. (ECF No. 84-2 at 40). In response, a note was made that he had a visit with a consultant scheduled. *Id.*

On November 2, 2016, Jones submitted a sick call request stating he could not see well and needed glasses. (ECF No. 84-1 at 66). Jones indicated his vision was getting worse and causing him "to see things that are not there." (*Id*). Note was made that Jones "[h]as eye consult already." (*Id*).

On November 15, 2016, Jones submitted another medical request form regarding his eyesight. (ECF No. 84-2 at 42). Jones said that he was legally blind and had been trying to get glasses since 2014. (*Id*). He indicated he had submitted multiple sick call requests but still had not received glasses. (*Id*). He noted that it was dangerous because he ran into things all of the time and could be seriously injured if he was not extremely carefully. (*Id*). He asked if he could be provided with glasses as quickly as possible. (*Id*). In response, note was made that he had an eye consult scheduled and was able to ambulate around the infirmary without difficulty. (ECF

9

No. 84-1 at 68).

On November 23, 2016, Jones was seen by Dr. Andrew Perin at the JEI for a follow-up glaucoma visit.   (ECF No. 84-1 at 68; ECF No. 84-2 at 44).   A follow-up visit was requested and note made that Jones would "probably need lensectomy." (ECF No. 84-2 at 48).

Dr. Liggett reviewed the notes from this visit for ocular hypertension and noted dorzolamide was added to Jones' regimen.   (ECF No. 84-1 at 68).   A follow-up visit was requested for about three weeks—around December 14, 2016.   (ECF No. 84-2 at 48).

Jones was next seen at the JEI on December 14, 2016.   (ECF No. 84-1 at 71).   Dr. Perin wrote that Jones should be continued on his current glaucoma drops and that he may need surgery. (ECF No. 84-2 at 56).   Jones was seen later that day by Dr. Uwaydat for further evaluation of the need for surgery.   (*Id*. at 59).   Dr. Uwaydat recommended lensectomy of both eyes starting with the left eye.   (*Id*. at 69).

Dr. Liggett noted Jones was going to be scheduled surgical repair of lens subluxation. (ECF No. 84-1 at 72).   A surgical clearance from cardiology was requested.   (*Id*).   On January 12, 2017, surgery was performed on Jones' left eye.   (ECF No. 84-2 at 81).

On January 20, 2017, Jones was seen at the JEI for a post-operative follow-up on his "Marfan's ocular disease & glaucoma."   (ECF No. 84-1 at 77; ECF No. 84-2 at 104, 107).   Jones was to be seen by the prison optometry department for corrective lenses and was to follow-up at the JEI in a month.   (ECF No. 84-2 at 109).

On February 1, 2017, Jones submitted a sick call request because he was seeing double out of his left eye.   (ECF No. 84-2 at 114).   Jones was seen at the JEI on February 17, 2017, for a post-operation status review.   (*Id*. at 117).   Jones denied having any problems at that time.   (*Id*.

at 119).    Dr. Uwaydat recommended that surgery on Jones' right eye be scheduled.    (*Id.* at 121).

On March 10, 2017, Jones was seen at optometry.    (ECF No. 84-2 at 132).    The plan was for Jones to continue care with ophthalmology with a follow-up scheduled in six months.    (*Id*).    A prescription was written for Jones for bi-focals.    (*Id.* at 133).    The eyeglasses were billed on March 17, 2017.    (*Id.* at 134).

On March 27, 2017, Jones submitted a sick call request noting that he had signed the surgery consent form over a month ago for the surgery on his right eye.    (ECF No. 84-3 at 75).    Nurse Robinson answered that he had an appointment scheduled for April 6, 2017; however, Jones had the surgery on March 30th.    (*Id.* at 75-76).    In Jones' opinion, Nurse Robinson was "negligent in her answer."    (*Id*).    Further, Jones stated that it was all treated as a "big game" by the Defendants.    (*Id*).

On March 30, 2017, surgery was performed on his right eye.    (ECF No. 84-2 at 142).    Jones was seen post-operatively at the JEI on March 31, 2017, and April 5, 2017.    (*Id.* at 160-61).    Jones testified that his vision improved following surgery and now his vision is corrected with glasses.    (ECF No. 84-3 at 57).

On April 13, 2017, Jones was issued his eyeglasses.    (ECF No. 84-2 at 170).    Dr. Vowell performed record reviews on March 31, 2017, and April 11, 2019.    (*Id.* at 86 & 88).

On April 28, 2017, an eye examination was performed on Jones with his eye-glasses on.    (ECF No. 84-1 at 89).    His visual acuity was recorded as 20/50 in the left eye, 20/50 in the right eye, and 20/50 in both eyes.    (*Id*).    Note was made that Jones failed the Snellen examination and a consult was necessary to have his glasses evaluated.    (*Id.* at 89).

On May 12, 2017, Jones was seen at the JEI.    (ECF No. 84-2 at 177).    His visual acuity

without correction in both eyes was noted to be 20/30.   (*Id*).   Prednisone eye drops were ordered for his right eye, twice a day, for two weeks.   (*Id*).   A follow-up appointment was to be scheduled in twelve weeks.   (*Id*).   Further, the following notation was made: "**PLEASE REFRACT AND FIT WITH GLASSES IN UNIT.**"   (*Id*)(emphasis in original).

On May 19, 2017, an eye examine was performed and a prescription written for eyeglasses for Jones.   (ECF No. 84-2 at 182).   His uncorrected visual acuity was listed as 20/40 in both eyes, 20/50 in the right eye, and 20/50 in the left eye.   (*Id.* at 183).   His corrected vision in both eyes was noted to be 20/30.   (*Id*).   That same day, his glasses were ordered.   (*Id.* at 184).

On June 4, 2017, Jones submitted a sick call request asking why he was being assigned glasses when he was allowed to have contacts for his medical condition.   (ECF No. 84-3 at 71).   Nurse Robinson responded that the ADC did not issue contact lenses.   (*Id.* at 71-72).   Jones testified that glasses would make his vision stable but contact lenses would improve his condition. (*Id.* at 72).   Jones conceded that after the surgery on his right eye the JEI physicians did not make a recommendation for contacts.   (*Id*. at 74).

On June 7, 2017, eyeglasses were dispensed to Jones.   (ECF No. 84-2 at 187).   Jones testified the glasses did not initially make it where he could see.   (ECF No. 84-3 at 36-37).   Jones indicated the prescription for the right eye had to be increased so that he could see and read.   (*Id*. at 37-38).   The glasses were bi-focals.   (*Id.* at 50).   Prior to this, the only glasses Jones had were reading glasses he bought from the commissary.   (*Id.* at 48).

Jones was next seen at the JEI on August 18, 2017.   (ECF No. 84-2 at 191).   It was noted that his vision had improved in both eyes.   (*Id.* at 194).   His visual acuity is listed as 20/20 with both eyes with his glasses on.   (*Id.* at 196).

On April 18, 2018, Jones submitted a medical request saying he had not been to the JEI yet that year; Jones asked when he would return to the JEI regarding his eye pressure and glaucoma. (ECF No. 95 at 14).   In response he was told the ADC no longer used the JEI and sent people to the Day Clinic instead.   (*Id*).   Jones was not advised whether he would be seen at the Day Clinic. (*Id*).

During his deposition, Jones was asked about his claims against Nurse Morgan. (ECF No. 84-3 at 77).   Jones noted that Nurse Morgan was the director of nursing.   (*Id*).   In that capacity, Nurse Morgan answered the sick calls and grievances.   (*Id*).   Jones testified he was also seen by Nurse Morgan a couple of times.   (*Id*).   Jones believes that "everything was like . . . a big coverup."   (*Id*).   In his view Defendants "tried to cover up or pacify the situation instead of try[ing] to resolve it."   (*Id.* at 77-78).   For example, in Nurse Morgan's response to grievance OR-16-0137, Nurse Morgan said Jones had been seen by the eye doctor on August 27th and was prescribed contacts which are not allowed in prison.   (*Id.* at 78).   Jones also pointed to Nurse Morgan's response to grievance OR-16-01515 was nearly identical; according to Jones, Nurse Morgan was "trying to cover up the situation, instead of resolv[ing]" it.   (*Id.* at 79).

With respect to Nurse Hart, Jones testified he was seen by Nurse Hart when he was in the intake process.   (ECF No. 84-3 at 79).   Jones testified that he told her about his vision problems. (*Id*).   Nurse Hart noted he had vision problems and even recorded that he could not see to sign his name on a paper.   (*Id*).   Jones testified Nurse Hart did intake and sometimes worked day clinic with Dr. Vowell.   (*Id.* at 80).   According to Jones, every time he went to Nurse Hart "it was delay and denial, the runaround."   (*Id*. at 80).   Jones testified that Nurse Hart "knew from the very beginning that I couldn't see and instead of trying to help the situation, she tried to cover up the

13

situation.   She delayed.   Delay and denial."   (*Id*. at 81).

Jones similarly testified that Dr. Vowell delayed getting him an eye appointment; said he was approved for contacts on the one hand and then advised him on the other hand that he was not getting contacts; and just in general delayed in providing him with either contacts or glasses that would provide him some semblance of sight.   (ECF No. 84-3 at 82-83).

Jones testified that Dr. Vowell sent him to the JEI and that he had no problem with his treatment at the JEI.   (ECF No. 84-3 at 88).   Jones states Defendants knew from the beginning that he had vision problems.   (*Id*).   Despite this, Jones asserts he was not provided with contacts or glasses for two years.   (*Id*).

Jones testified that going long periods of time without being able to see caused him to have anxiety attacks and the room would spin.   (ECF No. 84-3 at 61).   Jones testified his eyes continued to get worse and the only thing the Defendants did was provide him a cane.   (*Id.* at 61 & 67).   Jones indicated there was a period of time when he could not see past the length of his arm.   (*Id.* at 61).   Jones testified he "almost went legally blind, literally blind, because it took so long to give [him] anything, glasses, contacts, anything, any vision thing to see with."   (*Id.* at 85).   Jones was seen by a mental health professional and given medication to help ease his anxiety.   (*Id.* at 62).   Jones testified that he was told his eye pressure was so high he had no choice but to do the surgery or go blind.   (*Id*).

Dr. Jeffrey Stieve is employed as the regional medical director by Wellpath, LLC, "the medical care provider for inmates" in the ADC.   (ECF No. 84-4 at 1).   In this position, he oversees "the administration of medical services at the units comprising" the ADC.   (*Id*).   Dr. Stieve states that Jones "eye wear and subsequent diagnoses of glaucoma and subluxated lenses

14

are unrelated." (*Id.* at 2).

Dr. Stieve asserts that Jones did not met the requirements of Policy 710.00 to retain his contact lenses because Jones had not been diagnosed with "Keratoconus, Aphakia, or require a prescription greater than 10 diopters in one or both eyes.[8]"   (ECF No. 84-4 at 2).   Dr. Stieve notes that Jones was seen by an optometrist in January of 2015 and referred to the JEI for evaluation by an ophthalmologist.   (*Id*).   Dr. Stieve points out the record reflects that Jones was examined regularly at the JEI and the recommended treatment was implemented—eye drops and ultimately two surgeries to correct Jones' lens issue.   (*Id.* at 2-3).   Dr. Stieve again emphasizes that Jones' "glaucoma and subluxated lenses were diagnosed in April 2015 and are not related to whether or not Mr. Jones used contact lenses to correct his vision."   (*Id.* at 3).   In Dr. Sieve's medical opinion, Jones was provided with "appropriate care and treatment."   (*Id*)

## II.   LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."   *National Bank of Commerce v. Dow Chemical Co*., 165 F.3d 602, 607 (8th Cir. 1999).

---

[8] In response to one of Jones' grievance appeals, the Deputy Directors says:   "My staff spoke with the Regional Medical Director who advised that your condition is one in which contacts can be provided for you."   (ECF No. 74-2 at 10).

15

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. DISCUSSION

**(A). Motion for Partial Summary Judgment on the Issue of Exhaustion (ECF No. 73)**

Prisoners are required to exhaust the grievance procedures of the detention facility they are assigned to prior to filing a § 1983 suit. 42 U.S.C. § 1997e(a); *Jones v. Bock*, 549 U.S. 199, 218 (2007). The exhaustion requirement allows a prison to address complaints before being subject to suit, reduces litigation when complaints are resolved, and provides a useful record if suit is filed. *Jones*, 549 U.S. at 219.

**(1). Prior Opinion and Order (ECF No. 70) on Defendants' First Partial Summary Judgment Motion (ECF No. 57)**

In a Memorandum Opinion and Order entered on February 19, 2019 (ECF No. 70), it was concluded that Jones could proceed on the following claims:

- Grievance Number OR-15-00397 against all Defendants on Jones' claim that there was a delay in getting him examined by an ophthalmologist;

16

- Grievance Numbers OR-17-00592 against Nurse Robinson on Jones' claim that she failed to timely respond to a sick call request;

- Grievance Number OR-17-00976 against Nurse Robinson on Jones' claim that she lied about the ADC's policy regarding contact lenses; and

- Grievance Number OR-16-01367 against Dr. Vowell on Jones' claim that she failed to approve his request for eyeglasses;

The Court also rejected Defendants' argument that Jones could only claim damages for the period extending from fifteen days prior to each grievance's submission date to the date the issue raised was resolved.

The Court noted that it had to rely on Defendants' description of several of the grievances as they were not attached as exhibits. It was also noted that the declaration of the medical grievance coordinator did not mention the grievance numbers at issue. Defendants have now filed a new motion for partial summary judgment which attaches all relevant exhibits and a new declaration by the medical grievance coordinator.

### (2). The ADC's Grievance Policy

The ADC has a detailed three-step grievance procedure consisting of: step one, an informal unit level grievance; step two, a formal grievance; and step three, an appeal. (ECF No. 74-1 at 1-29). The grievance may address only one issue; the inmate is to be specific regarding the substance of the issue; the inmate is to include the date, place, and personnel involved; and state "how the policy or incident affected the inmate submitting the form." (*Id.* at 5-6). The inmate is limited to the space provided on the form and may not attach additional pages. (*Id.* at 6). The Unit Level Grievance Form "shall be completed and submitted within 15 days after the occurrence of the incident." (*Id.* at 5).

17

After receiving a decision on his Unit Level Grievance, a dissatisfied inmate may proceed to Step Two, the filing of a formal grievance.  (ECF No. 74-1 at 8)  The inmate does so by completing Step Two on the same Unit Level Grievance Form.   (*Id*).   The inmate is to state why he "considers the informal resolution unsuccessful."   (*Id*).   The inmate cannot raise new or additional issues or complaints.   (*Id*. at 2, 8-9, &11).   With respect to medical issues, the formal grievances are forwarded to the Health Services Administrator (HSA).   (*Id*. at 9).

An inmate has five working days to lodge an appeal to the appropriate Chief Deputy, Deputy, or Assistant Director.   (ECF No. 58-1 at 11).   If the grievance involves medical issues, the Step Two appeal goes to the Deputy Director for Health and Correctional Programs. (*Id*. at 12).

**(3).   Current Motion for Partial Summary Judgment on the Exhaustion Issue (ECF No. 73)**

Defendants' motion addresses two separate issues.   First, Defendants argue Jones failed to exhaust most of his claims against the Defendants.   Second, Defendants contend the fifteen-day time limit for the submission of grievances also acts as substantive limitation on damages.   In other words, Defendants contend Jones is limited to recovering damages for a period that begins fifteen-days prior to the submission of the grievance and ends on the date the issue addressed is resolved.

**Grievance OR-15-00397**

Grievance OR-15-00397 was submitted by Jones on April 4, 2015.   He wrote:

I have been here since Dec. 3, 2014, it is acknowledge[d] by medical staff that I cannot see definition of things.  I cannot read.  I can only see shadows, and the medical staff is showing deliberate indifference towards my medical needs denying me or showing negligence regarding the fact that I need to see a ophthalmologist. I have been given the run around by the medical staff regarding this matter, meanwhile my eyesight is constantly deteriorating while medical staff do nothing.

18

I am also having problems with my right foot, it is extremely painful to walk on, it is deformed, medical issued me tennis shoes but this does not help. I need these serious issues addressed today, because I can't see, and my foot is in pain!

(ECF No. 74-2 at 4).   In response, Jones was told he was not being given the run around and that

his appointment was scheduled for the date the JEI provided.   (*Id*).

Jones submitted a formal grievance.   The HSA responded as follows:

On April 10, 2015, you grieved you need treatment for your eyes.   You state medical has been deliberately indifferent towards your medical needs by denying that you need to see an ophthalmologist.

According to your medical records, you were seen by an ophthalmologist on April 7, 2015, at Jones Eye Institute (JEI).   Your appointment was originally scheduled at an earlier date; however, was canceled by JEI staff due to inclement weather. JEI rescheduled your appointment for a later date.   You were transported to JEI as scheduled in April and the appointment was held; therefore, your grievance was without merit.

(*Id*. at 3).

Jones appealed stating: "Although I went to the appointment on April 7 at Jones Eye

Institute the issue was not resolved regarding my eyes.   I still cannot see well, and my eyesight is

getting worse by the day."   (ECF No. 74-2 at 3).   The Deputy Director responded that the issue

regarding Jones' foot would not be considered because a grievance could address only one issue.

(*Id*. at 1).   Further, he said that "[a]ccording to the grievance policy, an appeal cannot raise new

or additional issues or complaints; therefore, the issue regarding the issue with your eyes not being

resolved will not be addressed at this time." (*Id*).   The appeal was found without merit as Jones

was seen by the ophthalmologist and acknowledged he was seen.   (*Id*).

Defendants contend the grievance's scope is limited to the issue of the alleged delay in

Jones being seen by an ophthalmologist.   The Court rejects this argument.   The grievance was

not so narrowly crafted.   It is clear from a full reading of the grievance, that the issue Jones was

grieving was the fact that nothing was being done about his inability to see.  The grievance submitted provided enough information for the prison officials to investigate the identified problem.

Defendants concede Jones may proceed with his grievance as to all Defendants because ADC officials did not reject the grievance for failure to name a person or entity.   Not withstanding this, Defendants contend that as Grievance OR-15-00397 was submitted on April 4, 2015, the earliest possible date Jones could be grieving about is 15 days prior to the grievance or March 20, 2015.  As Jones was examined by an ophthalmologist on April 7, 2015, this is the last possible date he could be grieving about

The Court believes the Defendants' interpretation is untenable.   Defendants seek to turn a procedural requirement of the ADC's grievance procedure into a substantive limitation on both the inmate's ability to pursue his claim and his ability to recover damages.   This the Court cannot do. *See e.g., Bailey v. Hobbs*, No. 5:11-cv-00031, 2012 WL 3041316, *6 (E.D. Ark. May 8, 2012, *report and recommendation adopted*, 2012 WL 3038856 (E.D. Ark. July 25, 2012)(rejecting the same argument).   The Court notes that the ADC did not challenge the timeliness of the grievances when they were filed; nor were the reviews conducted limited to this fifteen-day period.

### Grievances OR-17-00592 & OR-17-00976

Defendants concede Jones may proceed on both these grievances against Nurse Robinson. Grievance OR-17-00592 deals with Jones' claim that a non-party Nurse Gifford and Nurse Robinson did not timely respond to Jones' sick call request submitted on March 27, 2017.

With respect to Grievance OR-17-00976, Jones maintains his grievance named both Nurse Robinson and Dr. Vowell.   On June 9, 2017, Jones submitted a grievance stating that Nurse

Robinson was lying about ADC policy. (ECF No. 74-2 at 23). Jones noted that the Deputy Director had already confirmed that contact lenses could be provided for inmates with Jones' medical problem. (*Id*). In response, he was told that he had a procedure to "correct problems w/ your lenses. There is no order for contacts only eyeglasses." (*Id*). On July 27, 2017, Jones wrote he was appealing because he had received no timely response from the HSA regarding his grievance or an extension form. (*Id*. at 21). That same day, the HSA responded noting that Jones was seen on May 19, 2017, and was recommended for glasses. (*Id.* at 20). The HSA noted there was no evidence of an order for contacts and found the grievance without merit. (*Id*).

Jones appealed noting he had been told by Dr. Vowell that he was approved for contacts. (ECF No. 74-2 at 20). Further, he stated Rory Griffin had verified that contacts were allowed for someone with Jones' medical condition. (*Id*). In response, the ADC policy regarding contact lenses Operational Policies and Procedures 710.00 was quoted. (*Id.* at 19). The policy in part states that "[i]nmates arriving at the ADC with prescriptive contact lenses but no other prescriptive eyeglasses may retain and use the contact lenses until eyeglasses are provided by the medical department." (*Id*). Jones' record was reviewed which included the encounter notes from Jones' JEI appointment of April 23, 2017, and his May 19, 2017, appointment with the unit optometrist. (*Id*). The latter notes indicate Jones was prescribed eyeglasses and was provided with the same on June 7, 2017. (*Id*). No indication was given that Jones had attempted to assert new claims in his appeal. Jones may proceed with his claim against Nurse Robinson and Dr. Vowell on this grievance.

Defendants raise the issue of the fifteen-day time limit acting as a substantive limitation on the right to recover damages on these two grievances. As discussed above, the Court rejects this

argument.

**Grievance OR-16-01367**

As they argued previously, Defendants state this grievance only names non-parties and is not exhausted as to the Defendants.   In the grievance, Jones states he had an eye examine two years ago and he wanted to know why it had "taken so long to get a prescription for my glasses." (ECF No. 74-2 at 12).   Jones asserted he had sent in many sick calls requesting eyeglasses only to be told that it is the JEI's "job to get me glasses."   (*Id*).   Jones asserts that it is the ADC's responsibility to provide him with eyeglasses.   (*Id*).   He demands that CCS provide him with eyeglasses.   (*Id*).

Nurse Morgan responded that Jones had been prescribed contacts that were not allowed in prison, the provider had made the JEI aware of this, and now the JEI was consulting a cataract specialist.   (*Id.* at 11). The HSA further stated that Jones' upcoming appointment with the JEI would decide "if cataract surgery or specialized glasses is needed."   (*Id*).

In the appeal, Jones addressed Nurse Robinson's statement and named Dr. Vowell.   (*Id*). Specifically, Jones states that "[i]f contacts are not allowed in prison why did Dr. Vowell, tell me that I was approved [for] contacts."   (*Id.*).   The Deputy Director's decision does not treat this as a new or additional issue or indicate in any way that Jones may not raise the issue about Dr. Vowell's statement.   (*Id.* at 10).   Instead, the Deputy Director stated that Jones' appeal questions why Dr. Vowell told him contacts were approved for him if they were not allowed in prison.   (*Id*). The Deputy Director indicated he had consulted the regional medical director and Jones' condition was one for which contacts may be provided.   (*Id*).   The Deputy Director concludes Jones has "not been provided glasses because glasses have not been deemed medically necessary for your

condition." (*Id*). The appeal is found without merit although there is no explanation as to why Jones has not been allowed to have contacts instead of glasses. (*Id*).

Jones may proceed on this claim against Nurse Morgan and Dr. Vowell. Again, the Court rejects Defendants' fifteen-day damage limitation argument.

### Grievance OR-17-02003

Jones argues he should be considered to have exhausted this grievance. He submitted the grievance on November 21, 2017. (ECF No. 74-2 at 31). On November 27, 2017, he completed step two of the grievance stating the problem solver had failed to resolve the issue in the allotted time. (*Id*). On January 19, 2018, he filed an appeal stating the HSA never responded or submitted an extension form. (*Id.* at 30). Jones' appeal was rejected as untimely. (*Id.* at 29).

Jones maintains the untimeliness of the appeal should be excused because the HSA never responded to his formal grievance. This argument is rejected. The grievance procedure clearly allows an inmate to treat a non-response as a denial and to proceed to the next step. (ECF No. 74-1 at 7-12). Jones had the obligation to complete the steps of the grievance procedure in a timely manner.

### Grievance No. 16-01515

Jones argues he exhausted his remedies as to this grievance. The grievance dealt with Jones remaining in a holding cell for over twelve hours when an appointment with the JEI was canceled and transport was not timely advised. This grievance is outside the scope of the claims asserted in the Complaint and will not be further addressed.

### (B). Motion for Summary Judgment on the Merits (ECF No. 83)

With respect to any claims that have survived the partial motion for summary judgment on

the issue of exhaustion, Defendants contend they are entitled to summary judgment because Defendants did not exhibit deliberate indifference to Jones' serious medical needs. Defendants maintain that Jones' medical records, his deposition, and the affidavit of Dr. Jeffrey Stieve demonstrate that Jones received appropriate care for his eyes.

The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to prisoners' serious medical needs. *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012). To prevail on his Eighth Amendment claim, Jones must prove (1) that Defendants acted with deliberate indifference to (2) his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

> The test for deliberate indifference consists of two prongs. First, an inmate must show that he suffered from an objectively serious medical need. Second, an inmate must show that the defendant knew of and deliberately disregarded that need. Deliberate disregard is a mental state equivalent to criminal-law recklessness, which is more blameworthy than negligence, yet less blameworthy than purposely or knowingly bringing about a substantial risk of serious harm to an inmate.

*Barr v. Pearson*, 909 F.3d 919, 921 (8th Cir. 2018) (quotations and citations omitted).

To establish that he suffered from an objectively serious medical need, Jones must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citation omitted). Clearly, Jones has a serious medical condition with respect to his eyes.

For the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation." *Popoalii v. Correctional Med. Servs,*

512 F.3d 488, 499 (8th Cir. 2008) (citation omitted).    An "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Nelson v. Shuffman,* 603 F.3d 439, 449 (8th Cir. 2010) (citations omitted).    Despite this, issues of fact exist when there is a question of whether or not medical staff exercised independent medical judgment, and whether the decisions made by medical staff fell so far below the reasonable standard of care as to constitute deliberate indifference.    *See Smith v. Jenkins,* 919 F.2d 90, 93 (8th Cir. 1990).

When Jones was processed into the ADC, his medically prescribed contact lenses were confiscated by non-party security personnel.    Jones maintains each of the Defendants were aware of the fact that he was virtually blind.    His impaired vision was so serious there were times he was unable to work, read, write, protect himself from attack, watch television, or engage in recreational activities.    Additionally, his impaired vision caused him to have anxiety attacks and constant headaches.    He could not read, watch television, sign documents, or ambulate without using extreme care.    Jones was informed that contact lenses were forbidden and that he would be provided with eyeglasses.    However, he was given neither for a period of approximately two years.

Jones maintains the Defendants were deliberately indifferent to his serious medical need for eyewear in their continuing and ongoing failure to provide him with his prescribed contact lenses or eyeglasses.    The Court believes there are clearly genuine issues of material fact as to whether Defendants exhibited deliberate indifference to Jones' need to have some type of prescription eyewear that would improve his vision.    Jones' contact lenses were seized during his intake on December 8, 2014.    The ADC policy provided that inmates with no other prescriptive

eyewear should be allowed to keep their contacts.   The policy was not followed.   Each of the Defendants were aware of Jones' impaired vision and that his inability to see affected his daily living.   The medical records also indicate that on several occasions physicians with the JEI noted that Jones should be referred for corrective eyewear.   Despite this, Jones was not provided any corrective eyewear until June 7, 2017.

Defendants maintain that Jones cannot provide expert testimony that the delay in the provision of prescriptive eyewear adversely affected his medical condition.   Without such testimony, Defendants maintain Jones cannot prevail.

It is true that normally "[a] prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials 'ignored an acute or escalating situation or that [these] delays adversely affected his prognosis[,]'"   *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (citations omitted).   However, if the need for medical attention is obvious to a layperson, the plaintiff need not submit verifying medical evidence to show the detrimental effects of delay.   *See Schaub v. VonWald,* 638 F.3d 905, 919 (8th Cir. 2011)(*citing Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999)).   This is just such a case.   It was apparent that Jones' vision was impaired to the extent it affected his daily living.

Defendants also contend they are entitled to summary judgment in their favor because Jones failed to comply with Rule 56.1(c) of the Local Rules for the Eastern and Western Districts of Arkansas.[9]   Rule 56.1(c) provides that [a]ll material facts set forth in the statement filed by the moving party . . . shall be deemed admitted unless controverted by the statement filed by the non-moving party."   While Jones did not file a separate statement of facts in connection with this

---

[9] Jones filed a separate statement (ECF No. 78) in connection with the partial motion for summary judgment.

motion, his response in opposition to the summary judgment motion contains his statements of disputed fact. *See Johnson v. Arden*, 614 F.3d 785, 798 (8th Cir. 2010)(pro se pleadings afforded liberal construction); *but see Bennett v. Dr. Pepper/Seven Up, Inc.*, 295 F.3d 805, 808 (8th Cir. 2002)(pro se status does not excuse litigant from following the local rules). The Court declines to require strict adherence in this case. The Court will consider Jones' filings.

Next, Defendants contend they are entitled to summary judgment in their favor because of the protection afforded by qualified immunity. Government officials are entitled to qualified immunity if their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A two-part test is used in determining if qualified immunity applies: (1) "whether the facts alleged, construed in the light most favorable to [the Plaintiff], establish a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the alleged violation, such that a reasonable [official] would have known his actions were unlawful." *Branch v. Gorman*, 742 F.3d 1069, 1072 (8th Cir. 2014).

The court may address these elements in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The official is entitled to qualified immunity "unless the answer to both of these questions is yes." *Burton v. St. Louis Bd. of Police Comm'rs*, 731 F.3d 784, 791 (8th Cir. 2013)(quotations and citations omitted).

For qualified immunity purposes, the facts as set forth above demonstrate that the alleged conduct on the part of each of the Defendants violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The answer to the first question is yes.

The Court must now ask if the right was clearly established "so that a reasonable official

would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (citation omitted).    Defendants are all medical professionals.    Jones' poor vision without glasses constitutes a serious medical need. *Benter v. Peck*, 825 F. Supp. 1411, 1416-17 (N.D. Ind. 1995)(poor vision constituted a serious medical need for prescription glasses that even a layperson would recognize).    Each of the Defendants was aware of Jones' impaired vision.    The Court believes the right to treatment in the form of prescriptive eyewear was clearly established at the time of the alleged violation, such that a reasonable nurse or physician would have known his or her actions in withholding treatment were unlawful.    *Id.* at 1418 (a reasonable official would have provided treatment for inmate with impaired vision).    The answer to the second question is yes. Defendants are not entitled to qualified immunity.

Jones has asserted an official capacity claim.    Official capacity claims are " functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home,* 627 F.3d 1254, 1257 (8th Cir. 2010).    To hold a governmental entity liable, a plaintiff must establish that a municipal policy or custom caused the deprivation of his constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 389-91 (1989).    This requires a plaintiff to prove the custom or policy was the moving force behind the constitutional violation.    *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 694 (1978).    Here, Jones contends the Defendants failed to follow policy.    He does not argue there was anything unconstitutional about the policy or that it was the moving force behind the alleged constitutional violations.

Finally, the Court believes Nurse Robinson is entitled to summary judgment on the merits of claim asserted in OR-17-00592 that she failed to timely respond to a sick-call request submitted on March 27, 2017.    Such a failure, on a single occasion, can amount to nothing more than

negligence.  *See e.g., McRaven v. Sanders*, 577 F.3d 974, 982-983 (8th Cir. 2009)(negligent conduct does not violate § 1983—nurse cannot be held liable for mistaking drug intoxication as alcohol intoxication—medical negligence does not violate the Eighth Amendment).

## IV.  CONCLUSION

For the foregoing reasons, I recommend the following:

(1).  The Defendants' Motion for Partial Summary Judgment (ECF Nos. 73-75) on the issue of exhaustion should be granted in part and denied in part**.**   Specifically, the Motion should be granted as to all grievances **except for the following four grievance numbers.**  Plaintiff should be found to have fully exhausted the claims addressed in:

- Grievance Numbers OR-15-00397 against all Defendants—nothing done about his inability to see;
- OR-17-00592 against Nurse Robinson—failure to timely respond to sick-call request submitted March 27, 2017;
- OR-17-00976 against Nurse Robinson and Dr. Vowell—why he was not allowed to keep his contact lenses at intake or provided them as being medically necessary in accordance with ADC policy; and
- OR-16-01367 against Dr. Vowell and Nurse Morgan—waiting for two years for eyewear.

The Motion should be denied to the extent that Defendants seek to limit Jones's claims and the recovery of damages to a time period beginning fifteen days prior to the filing of each grievance and ending on the date the grievance is resolved.

29

(2).   Defendants' Motion for Summary Judgment on the Merits (ECF Nos. 83-85) should be granted in part and denied in part.   Specifically, the motion should be granted as to the negligence claim asserted in OR-17-00592 against Nurse Robinson and all official capacity claims. In all other respects, the motion should be denied, and the case scheduled for a jury trial.

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).   The failure to file timely objections may result in waiver of the right to appeal questions of fact.   The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 22nd day of October 2019.

/s/ Barry A. Bryant
_____
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE